## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

-------------------------------------------------------------------- x

ROBERTO E. CALLE GRACEY, on behalf of himself and
all others similarly situated,

        No. _____

        JURY TRIAL DEMANDED

        Plaintiff,

     *-against-*

BANK OF AMERICA CORP., BANK OF AMERICA
LLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL
INC., CITIBANK, NA, CITIGROUP GLOBAL
MARKETS INC., CREDIT SUISSE GROUP AG,
CREDIT SUISSE SECURITIES (USA) LLC,
DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITIES INC., ROYAL BANK OF SCOTLAND
GROUP PLC, RBS SECURITIES INC., HSBC
HOLDINGS PLC, HSBC SECURITIES (USA) INC.,
JP MORGAN CHASE & CO., J.P. MORGAN
CLEARING CORP., J.P. MORGAN FUTURES, INC.,
LLOYDS BANKING GROUP PLC, THE
NORINCHUKIN BANK, UBS AG, UBS SECURITIES,
LLC and WEST LB AG,

        Defendants.

-------------------------------------------------------------------- x

## CLASS ACTION COMPLAINT

    Plaintiff complains of Defendants as follows:

    1.    **(a) Agreement**.  Between January 1, 2007 and April 30, 2009 (the "Class Period"), the Manipulator Defendants (*see* ¶ 58 *infra*) combined, conspired and agreed to manipulate the U.S. Dollar London Interbank Offered Rate ("LIBOR") to artificially low levels in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et. seq.,* Section 9(a) of the Commodity Exchange Act, 7 U.S.C. §13, and State law.

(b) During the Class Period, Dollar LIBOR served as the contractually agreed-upon determinant of the amount of payments due under literally billions of dollars worth of standardized contracts, including many financial futures contract transactions made in this District on the Chicago Mercantile Exchange ("CME") and the Chicago Board of Trade ("CBOT").  Among these standardized contracts was the CME's Eurodollar futures contract.  It was the largest and most actively traded futures contract in the world.

(c) The Manipulator Defendants' unlawful conduct caused and forced CME Clearing (*see* ¶¶ 31, 57 *infra*) to settle CME Eurodollar and many other standardized futures contracts at the manipulated LIBOR prices caused by the Manipulator Defendants.

(d) This violated CME Rule 432 and similar CBOT rules prohibiting price manipulation.  Thereby, this also breached the standardized CME Eurodollar futures contract and other standardized CME and CBOT futures contracts.  This was because such contracts all expressly provided that their performance was subject to and contractually required to comply with the CME or CBOT Rules.

(e) The Clearing Defendants (*see* ¶ 59 *infra*), who are subsidiaries or affiliates of the Manipulator Defendants and were members of CME Clearing during the Class Period, knowingly aided and abetted the manipulation.  Also, they otherwise breached their duties, including their duties to Class members who purchased Eurodollar or other futures contracts directly from the Clearing Defendants, by their conduct alleged herein.

2.      The British Bankers Association ("BBA"), in connection with Reuters Group PLC ("Reuters"), a London-based business data and news company, compiled and published LIBOR from interest rate information reported to it daily by a contributing group of banks (the "Panel").  The Manipulator Defendants were the primary members of such panel, and the

Manipulator Defendants' subscription payments supported the BBA.  The BBA defined LIBOR as "the rate of interest at which banks borrow funds from each other, in marketable size, in the London interbank market."

3.      (a) On April 17 and 18, 2008, the Dollar LIBOR increased dramatically.

(b) For example, 3 month Dollar LIBOR increased from 2.73375% on April 16 to 2.90750% on April 18, 2008, a two day cumulative net change that was so large that it constituted an extremely rare, **5.53 standard deviation event.**

(c) The extraordinarily large and rare increases in Dollar LIBOR on April 17 and 18, 2008 were not accompanied by any simultaneous or corresponding increases (1) in each Manipulator Defendant's operating costs, (2) in interest rates other than Dollar LIBOR, (3) in Federal Reserve policy, (4) in the demand for credit in U.S. dollars, nor (5) in any other factors pertinent to interest rates.

4.      Although the dramatic increases in Dollar LIBOR on April 17-18, 2008 were not explained by the fundamentals for interest rates, they were explained by and, in fact, immediately followed the publication by *The Wall Street Journal* of a report that the Manipulator Defendants had previously been systematically understating to the BBA each Manipulator Defendant's costs of borrowing that were used such to calculate and report Dollar LIBOR. *Compare Nasdaq Market-Makers Antitrust Litig*., 169 F.R.D. 493, 518 (S.D.N.Y. 1996) (Defendants' immediate and large  reductions in their spreads after public reports of inflated spreads, when there were no changes in the determinants of spreads, suggested the existence of a prior agreement to inflate spreads).

5.      The foregoing indication that the Manipulator Defendants were collusively understating their Dollar LIBOR dovetails with numerous other statistically unusual events

similarly indicating such coordinated understatement by the Manipulator Defendants.  These events include but are not limited to:

(a) the breakdown and, indeed, the actual reversal during the Class Period of the well established historical relationship between the Eurodollar Bid Rate and Dollar LIBOR (*see* ¶¶ 27, 81 *infra*);

(b) the discrepancies between the Manipulator Defendants' costs of borrowing reflected in Dollar LIBOR and the Manipulator Defendants' costs of borrowing reflected in (1) the market for each Manipulator Defendant's own commercial paper, *see* ¶¶ 27, 82 *infra*, or (2) even the market for **collateralized** loans to each Manipulator Defendant from the Federal Reserve (*see* ¶¶ 27, 83 *infra*); and

(c) the increases and the variances in the prices of credit default swaps ("CDS") on different Manipulator Defendants during the Class Period, *see* ¶¶ 73-79 *infra*, contrasted with the stability (except for immediately following the previously-alleged *The Wall Street Journal* article) and the eerie sameness of Dollar LIBOR.  *See* ¶¶ 22-26, 71-72, 84-89 *infra*).

6.   Each of the above comparators indicated, quite correctly, that the credit risks posed by the Manipulator Defendants were substantially increasing during the Class Period. Logically, Manipulator Defendants' costs of borrowing funds (and the likelihood that they would default on their borrowings) greatly increased as the Manipulator Defendants' financial prospects were deteriorating.  *See* ¶¶ 18-19 *infra*.

7.   But Dollar LIBOR deviated from all such comparators.

8.   (a) However, various Manipulator Defendants publically and repeatedly denied during 2008 that such underreporting had occurred.  *See* ¶¶ 75-77, 127 *infra*.  The BBA, which conducted an investigation, also denied such underreporting.  *See* ¶¶ 10, 71, 128 *infra.*

Moreover, despite the regulation of banks by various governments, there was a complete absence during 2008 of any government investigation of such underreporting. And there were no actions by the CME, the CBOT or the U.S. Commodity Futures Trading Commission ("CFTC").

(b)The denials by the Manipulator Defendants and even the BBA, coupled with the absence of government or exchange investigations and all the other facts, tolled the running of the statute of limitations applicable to the continuing violation from which the claims here arise.

9. Recently, these "tolling" facts have been reversed. First, multiple government agencies have now begun to investigate the Manipulator Defendants' reporting of their U.S. Dollar LIBOR information during 2007-2008. This includes the United States Department of Justice, the CFTC, and the U.S. Securities and Exchange Commission ("SEC"). It also includes Japanese and European governmental authorities. *See* ¶¶ 129-31 *infra*; *Starr v. Sony BMG Music Entertainment,* 592 F.3d 314, 323 (2d Cir. 2010) (allegations of pending governmental investigations was a factor placing price-fixing allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action".

10. Second, such announcements of government investigations have not been contradicted by repeated insistences that the Dollar LIBOR reporting was accurate. *See* ¶ 132 *infra*.

11. Based upon those important changes and the totality of the allegations herein, Plaintiff now has good grounds to believe and does allege the claims set forth herein.

12. **Parallel conduct.** Each Manipulator Defendant began, at or about the time of the start of the Class Period, to understate its LIBOR information compared to contemporaneous other rates and historical norms. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 n. 4 (2007)

("complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy") (internal quotation marks omitted) ("*Twombly*").

13.     **Further Circumstance # 1.**  In immediate response to news reports that Manipulator Defendants were underreporting their borrowing rates, Dollar LIBOR soared on April 17-18, 2008 dramatically upward in a rare 5.53 standard deviation event when there was no corresponding change in each Manipulator Defendant's operating costs or the fundamentals for interest rates.  *Compare Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 518 (S.D.N.Y. 1996) *with* ¶¶1-3 *supra*.

14.     **Further Circumstance # 2 (multiple reciprocal action required).**  No single Manipulator Defendant had control over the LIBOR rate.

15.     (a) Even a much smaller change than the five-plus standard deviation change in LIBOR on April 17-18 could not have occurred if only a few Manipulator Defendants greatly increased their reported borrowing rates to a level far above the rates reported by others.

(b) On the contrary, as more fully alleged hereinafter, the fixing of LIBOR involved (1) collecting reported borrowing rates from sixteen designated banks, (2) discarding the highest and lowest quartiles, and then (3) **averaging the middle eight reports**.

(c) In addition to the trimming and averaging of the reported rates by the BBA, each Manipulator Defendant was realistically limited in how much it could credibly increase its reported cost of borrowing.  This constraint was imposed by the need for at least the appearance of rationality in the amount of day to day changes that each Manipulator Defendant made in its report to the BBA.

16.     The foregoing constraints meant that, on April 17-18, 2008, multiple Manipulator

Defendants simultaneously and significantly **had** to increase their reported borrowing rates in order to produce the dramatic increase in Dollar LIBOR reported. *See Twombly*, 550 U.S. at 557 n. 4 (dramatic change in pricing may be plausible evidence of agreement).

17.     Such multiple simultaneous increases by numerous Manipulator Defendants, when there was no corresponding change in the fundamentals for interest rates or their respective businesses, were extremely unlikely in a competitive market, and were far more likely the product of agreement than of competitive individual actions.

18.     **Further circumstance #3 (common motive).** For the same reasons as alleged in ¶¶14-17 above, no Manipulator Defendant on its own could gain the benefit of a lower dollar LIBOR rate by simply understating its own rate of borrowing. Multiple other Manipulator Defendants each reciprocally also had to underreport its own cost of borrowing in order for all the Manipulator Defendants to achieve the benefits of lower dollar LIBOR.

19.     (a)  The Manipulator Defendants had crucial economic survival motives to organize the coordination and collusion necessary to produce the cumulative understatements in their borrowing costs sufficient to reduce LIBOR. This motive was that the Manipulator Defendant banks were beginning from 2007 forward to gradually descend into a full-blown financial crisis. This crisis later began during 2008 to result in the failure of many investment and commercial banks and the biggest economic downturn since the Great Depression.

(b) Each Manipulator Defendant wanted to avoid a run on its own bank. Each Manipulator Defendant also had many counter-party dealings with the other Manipulator Defendants. Thus, each Manipulator Defendant also had a motive to coordinate in order to avoid a "weak counterparty brings down the stronger counterparty" phenomenon. In order to increase

their chances of survival, and/or to avoid eroding confidence in the banking system, the Manipulator Defendants were highly motivated to agree to understate their borrowing costs.

20.     **Further circumstance #4 (opportunity to conspire).**  The Manipulator Defendants had many communications between and among themselves.  They also had daily talks with brokers for interbank loans.  They had communications through other means (including BBA).  The Manipulator Defendants even had communications with the BBA in response to its investigations of underreporting from the latter half of 2007 forward.  Through all these communications, the Manipulator Defendants could discuss and monitor their reports of LIBOR.

21.     Because there was, at all relevant times, a high degree of effective direct and indirect communication between and among the Manipulator Defendants in multiple contexts, the Manipulator Defendants had the opportunity to conspire to suppress and set artificially low dollar LIBOR rates.

22.     **Further circumstance #5.**  In an analysis of reported LIBOR rates commissioned by *The Wall Street Journal*, the rates reported by the Manipulator Defendants for three-month dollar LIBOR were within a range of 0.06% during the first four months of 2008.  Three experts, including finance Professor Darrell Duffie at Stanford University, stated that the reported rates were suspicious. Professor Duffie concluded that the reported rates "are far too similar to be believed."

23.     This eerie convergence was a conspicuous deviation from the competitive market. It ignored disparities between the different banks' likelihood of default that the competitive market regarded as very important.  Such convergence was therefore the exact opposite of what

would have been expected to have occurred in a competitive market operating free of collusion in the conditions of 2007-2009.

24.     Specifically, during the Class Period, the financial condition of Defendants steadily diverged from one another depending on their relative exposures (a) to home mortgage defaults, (b) to the particular portfolio of home mortgages held by a bank,  (c) to borrowers or finance companies dependent upon home mortgage business or consumer credit, (d) to one another, and (e) to dramatically worsening areas of the economy in which loans had been made based upon inadequate collateral and unrealistic income support for the credit extended.

25.     In such an environment, the variation between and among the rates reported by the Manipulator Defendants to the BBA *should have increased in competitive market conditions.*  Instead, the disparities eerily shrank to the point of almost non-existence, which provoked the public reports and studies during April and May 2008.

26.     This dramatic and consistent change in the behavior of LIBOR would not have occurred unless the Manipulator Defendants coordinated their LIBOR reporting pursuant to a pre-fixed range rather than market realities.  This, also, is far more likely the product of agreement and combined action rather than individual conduct.  *See Twombly*, 550 U.S. at 557 n. 4.

27.     **Further circumstance #7.**  As a "price signature" of the Manipulator Defendants' agreement to understate Dollar LIBOR, Dollar LIBOR deviated to substantially lower levels compared to its expected relationship with numerous competitive market rates. These include but are not limited to the Eurodollar Bid rate, credit default insurance (credit default swaps) rates, the commercial paper rate for each Manipulator Defendant, and the Federal Reserve Collateralized Loan Rate.  *Twombly*, 550 U.S. at 557 n. 4.

28.   **Injury**. (a) Plaintiff purchased standardized CME Eurodollar futures contracts. CME Eurodollar futures contracts do not call for delivery of Eurodollars.

(b)      Instead, the CME specifies that Dollar LIBOR shall be used as the sole basis for satisfying CME Eurodollar futures contracts through a financial settlement that moves the Eurodollar price inversely to the LIBOR rate.  *See* CME Rulebook Chapter 452, "Interpretations and Special Notices."

(c)  By suppressing and manipulating LIBOR to artificially low levels, the Manipulator Defendants necessarily manipulated and directly inflated CME Eurodollar futures contract prices to artificially high levels.

(d) The Manipulator Defendants also directly and foreseeably caused market participants to trade such standardized futures contracts at higher price levels.  This is because the futures markets are anticipatory markets.  The current and prospective higher settlement prices of CME Eurodollar futures contracts created higher reference points for the expectations of all market participants.

(e) Thus, the direct and foreseeable effect of the Manipulator Defendants' intentional understatements of their LIBOR rate was to cause Plaintiff and the Class to pay *supra*-competitive prices for CME Eurodollar futures contracts during the Class Period.

(f)  Each Manipulator Defendant well knew, from its financial sophistication and its familiarity with CME Eurodollar futures contracts (which, again, are the largest and most actively traded futures contracts on Earth) and other futures contracts, that such contracts traded with reference, and settled to and solely to, dollar LIBOR.

(g) Therefore, each Manipulator Defendant also necessarily knew, and unavoidably and specifically intended, that its understatement of LIBOR would directly interfere with the

settlement price of and otherwise manipulate the trading prices of the standardized Eurodollar and other futures contracts traded on the CME and CBOT.

(h) Thereby, each Manipulator Defendant knowingly and intentionally manipulated the prices of the standardized CME and CBOT futures contracts that settled to LIBOR, specifically including the Eurodollar futures contracts traded on the CME.

(i) Further, CME Eurodollar futures contracts were subject to, and contractually required to be performed in accordance with, the CME rules, including CME Rule 432 prohibiting price manipulation.  And the Clearing Defendants' conduct and relations with their customers were all subject to the CME Rules which prohibit manipulation.  By knowingly and intentionally manipulating LIBOR lower, the Manipulator Defendants knowingly and intentionally caused the Clearing Defendants and CME Clearing to settle Eurodollar futures contracts at manipulated, artificially high prices in violation of CME Rule 432 and Chapter 452 of the CME Rulebook.

(j) This caused a breach of contracts and other duties and relations, and otherwise interfered with prospective business advantages and relations of Plaintiff and Class members.

(k)   The Clearing Defendants knowingly aided and abetted their parents' manipulation of Eurodollar futures contract prices.  Also Class members, including Class members who purchased their CME Eurodollar futures contracts directly from or through the Clearing Defendants, have additional claims for breach of duty against the Clearing Defendants.

## JURISDICTION AND VENUE

29.     The Eurodollar is a commodity and is the commodity underlying  CME Eurodollar futures contracts, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25.

30.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.  For the state law claims the Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a different state than of the Defendants.

31.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each of the Defendants transacts business, maintains offices or is found within this state, and a substantial part of the actions or omissions giving rise to the claims asserted herein occurred in the Northern District of Illinois.  Defendants' unlawful actions manipulated the prices of CME Eurodollar futures contracts which are traded in this District on the CME and the CBOT, and other standardized contracts priced on the basis of Dollar LIBOR.  *See* ¶ 57 *infra*.

32.     The Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.  Upon information and belief, the unlawful acts alleged herein were in the flow of and substantially affected interstate trade and commerce.

## THE PARTIES

33.     Plaintiff Roberto Calle Gracey ("Calle Gracey") is a natural person residing in London, England.  During the Class Period, Calle Gracey bought Eurodollar futures contracts on the CME and suffered losses and other legal injury, including being deprived of transacting in a

non-manipulated market, and was injured in his property by reason of Defendants' manipulation of the Eurodollar futures contract market as alleged herein.

34.     Each Manipulator Defendant is active in the market for CME Eurodollar futures contracts and was extremely well aware of the effects that manipulation of LIBOR was having on the Eurodollar futures contract market, as well as the markets for other standardized contracts priced on the basis of Dollar LIBOR.  With such knowledge, each Manipulator Defendant intentionally caused LIBOR to lower and thereby manipulated to artificial levels CME Eurodollar futures contracts and other standardized contracts priced on the basis of Dollar LIBOR.

35.      Defendant Bank of America is a corporation organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina. At all times pertinent hereto, Bank of America served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

36.     Defendant Bank of America Securities LLC ("Bank of America Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Bank of America and was engaged in clearing CME futures contracts.

37.      Defendant Barclays Bank plc ("Barclays") is a corporation organized under the laws of England, with its principal place of business in London, England. At all times pertinent hereto, Barclays served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

38.     Defendant Barclays Capital Inc. ("Barclays Capital") was, during all or part of the Class Period, a subsidiary or affiliate of Barclays and was engaged in clearing CME futures contracts.

39. Defendant Citibank NA is a wholly owned subsidiary of Citigroup, Inc., a corporation organized under the laws of Delaware, with its principal place of business in New York, New York. At all times pertinent hereto, Citibank served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

40. Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") was, during all or part of the Class Period, a subsidiary or affiliate of Citibank NA and/or Citigroup, Inc. and was engaged in clearing CME futures contracts.

41. Defendant Credit Suisse Group AG ("Credit Suisse") is a corporation organized under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. At all times pertinent hereto, Credit Suisse served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

42. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Credit Suisse and was engaged in clearing CME futures contracts.

43. Defendant Deutsche Bank AG ("Deutsche Bank") is a corporation organized under the laws of Germany, with its principal place of business in Frankfurt, Germany. At all times pertinent hereto, Deutsche Bank served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

14

44.     Defendant Deutsche Bank Securities ("Deutsche Bank Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Deutsche Bank and was engaged in clearing CME futures contracts.

45.     Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a corporation organized under the laws of Scotland, with its principal place of business in Edinburgh, Scotland. At all times pertinent hereto, Royal Bank of Scotland served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

46.     Defendant RBS Securities Inc. ("RBS  Securities") was, during all or part of the Class Period, a subsidiary or affiliate of Royal Bank of Scotland and was engaged in clearing CME futures contracts.

47.     Defendant HSBC Holdings plc ("HSBC") is a corporation organized under the laws of England and Wales, with its principal place of business in London, England. At all times pertinent hereto, HSBC served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

48.     Defendant HSBC Securities (USA) ("HSBC Securities") was, during all or part of the Class Period, a subsidiary or affiliate of HSBC and was engaged in clearing CME futures contracts.

49.     Defendant JP Morgan Chase & Co. (JP Morgan") is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York. At all times pertinent hereto, JP Morgan Chase served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

50.     Defendant JP Morgan Clearing Corp. ("JP Morgan Clearing") was, during all or part of the Class Period, a subsidiary or affiliate of JP Morgan and was engaged in clearing CME futures contracts.

51.     Defendant JP Morgan Futures, Inc. ("JPMFI") was, during all or part of the Class Period, a subsidiary or affiliate of JP Morgan and was engaged in clearing CME futures contracts.

52.     Defendant Lloyds Banking Group plc ("Lloyds") is a corporation organized under the laws of the United Kingdom, with its principal place of business in London, England. Lloyds was formed through the 2009 acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB").  At all times pertinent hereto, Lloyds TSB and HBOS served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

53.     Defendant the Norinchukin Bank ("Norinchukin") is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan. At all times pertinent hereto, Norinchukin served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

54.     Defendant UBS AG ("UBS") is a corporation organized under the laws of Switzerland, with its principal place of business in Zurich, Switzerland. At all times pertinent hereto, UBS served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

55.     Defendant UBS Securities LLC ("UBS Securities") was, during all or part of the Class Period, a subsidiary or affiliate of UBS and was engaged in clearing CME futures contracts.

16

56.     Defendant West LB AG ("West LB") is a corporation organized under the laws of Germany, with its principal place of business in Dusseldorf, Germany. At all times pertinent hereto, West LB served on the Panel which reported interest rate information, and did report such information, used by the BBA in deriving United States Dollar LIBOR.

57.     CME's website states that on July 12, 2007, CBOT Holdings, Inc. merged with and into Chicago Mercantile Exchange Holdings Inc. to form CME Group Inc.  "CME Clearing" is described therein as an operating division of CME Group, Inc., which clears trades made on both the CME and CBOT, as well as on other exchanges and certain over-the-counter ("OTC") trades.  http://www.cmegroup.com/clearing/files/financialsafeguards.pdf.

58.     As used herein, Defendants Bank of America, Barclays, Citibank NA, Credit Suisse, Deutsche Bank, Royal Bank of Scotland, HSBC, JP Morgan, Lloyds, Norinchukin, UBS, and West LB are referred to collectively as the "Manipulator Defendants."

59.     As used herein, Defendants Bank of America Securities, Barclays Capital, Citigroup Global Markets, Credit Suisse Securities, Deutsche Bank Securities, RBS Securities, HSBC Securities, JPM Clearing, JPMFI, and UBS Securities are referred to collectively as the "Clearing Defendants."

## SUBSTANTIVE ALLEGATIONS

**The United States Dollar Three-Month Quotation of the London Interbank Offered Rate ("LIBOR") Is the Reference for the CME Eurodollar Futures Contract, Whose Price Moves Inversely To the Movement of U.S. Dollar LIBOR**

60.     The British Bankers' Association ("BBA"), in connection with Reuters Group PLC ("Reuters"), a London-based business data and news company, compiles and publishes LIBOR from interest rate information supplied by Defendant Banks. The BBA defines LIBOR as

"the rate of interest at which banks borrow funds from each other, in marketable size, in the London interbank market."

61.     Each of the Manipulator Defendants is a member of the Panel which contributes to the BBA the interest rate information from which U.S. Dollar LIBOR is derived. The BBA instructs all banks which contribute interest rate information for the fixing of LIBOR to contribute to Reuters each morning the rate at which it could borrow funds on an unsecured basis, were it to do so by asking for and then accepting interbank offers in reasonable market size just prior to 11:00 a.m. London time. Each Manipulator Defendant is further instructed to contribute rates for such of the above-referenced currencies which correspond to its Panel membership(s), in fifteen maturities ranging from overnight to one year.

62.     LIBOR is also used to calculate the interest rates, particularly for loans maturing in one year or less, on a wide range of contracts including, without limitation, mortgages, interest rate swaps, Eurodollar futures and options contracts traded on the Chicago Mercantile Exchange ("CME"), OTC swap futures, CBOT mini-sized Eurodollar futures and options contracts, and CBOT 5-Year, 7-Year, 10-Year and 30-Year Interest Rate Swap futures and options contracts.

63.     For example, CME Eurodollar futures contracts such as those purchased by Plaintiff are not satisfied by deliveries.  Instead, they financially settle to (and solely to) the United States Dollar LIBOR rate, and their price is inversely related to LIBOR.  Therefore, as the Manipulator Defendants reduced LIBOR, Eurodollar futures contract prices increased commensurately.

64.     LIBOR's use and influence extend far beyond banking.  The Manipulator Defendants sell many financial instruments whose prices increase and become more costly as LIBOR decreases and purchase many instruments whose prices decrease as LIBOR decreases.

65.     LIBOR also provides a key indicator of the financial health of banks. When banks have relatively easy access to funds, their borrowing rates are low. Conversely, when banks' access to funds is more difficult, their borrowing rates increase.

66.     By 2007, the large, international banks which dominate the United States Dollar LIBOR "offshore" Panel had larger exposures to subprime mortgages and structured investment vehicles than many of the domestic banks which dominate "onshore" LIBOR Panels. Many of the banks in the U.S. Dollar LIBOR Panel were perceived to have significant exposure to structured credit products.

67.     Beginning in 2007, increasing numbers of banks began to detect potential difficulties with subprime and other loans. Widespread problems involving subprime mortgages, could tighten the availability of credit to banks and increase the interest rates paid by banks on their own borrowings.

68.     But the banks did not want their increasing cost of funds to become public knowledge. As illustrated by the subsequent collapse of Bear Stearns, even the perception of financial difficulty can have negative repercussions with investors and clients. The Manipulator Defendants did not want to disclose to the market their increasing costs of short-term borrowing and thereby reveal the fact, or even the probability or indication, that they were having difficulty obtaining funds.

69.     In order to avoid such perceptions, the Manipulator Defendants agreed to underreport and began understating in their daily reports to the BBA the interest rates they would pay for unsecured short term loans in the London interbank market.

70.     Pursuant to an agreement, combination and conspiracy among themselves, the Manipulator Defendants deliberately manipulated U.S. Dollar LIBOR during the Class Period by

reporting inaccurate, misleading and false interbank borrowing rates to the BBA. The

Manipulator Defendants, through their employees and agents, were direct participants in this

unlawful conduct to manipulate U.S. Dollar LIBOR pursuant to agreement among themselves.

**At A Time When Other Indicia Reflected Defendants' Divergent Responses to the Financial Crisis, Defendants Agreed To Mask That Divergence by Falsely Reporting That Their Borrowing Costs Were Converging At Lower Rates**

71.     Interbank market rates reached record levels in September 2007, as losses on

securities linked to subprime mortgages in the United States deterred lenders from making

advances to any but the safest borrowers.  But LIBOR did not respond.   At meetings held in

November 2007 and April 2008 by a Bank of England money-market committee, which includes

banks as well as the BBA, participants reportedly questioned the reliability of the LIBOR rates.

Minutes of the April 3 discussions reportedly say that "U.S. dollar LIBOR rates had at times

appeared lower than actual traded interbank rates."

72.     Thus, despite tightening conditions in the credit markets, by early 2008, U.S.

Dollar LIBOR rates submitted by banks on the Panel (including the Manipulator Defendants) did

not substantially increase, decrease, or vary from one another.  In fact, during the first four

months of 2008, the Panel reported borrowing rates which remained, on average, within a range

of only 0.06%, in relation to the average U.S. Dollar LIBOR for the period of 3.18%.  This

convergence of submitted rates was observed despite the fact, indicated by other measures of the

market, that different banks were experiencing different levels of financial stress.

73.     For example, in early 2008, when *The Wall Street Journal* conducted an analysis

of the default insurance market, including credit default swaps ("CDS"), comparing the costs of

insuring against banks defaulting on their debts with those banks' borrowing costs as submitted

to LIBOR, it found that historically those costs moved in tandem.  But beginning in late January

2008, amid growing fears of bank failures, the two metrics began to diverge.  As many banks'
financial condition became (or was perceived to have become) unsound, the cost of purchasing
CDSs, or default insurance on such banks, was rising.  But borrowing costs for such banks, as
reflected by LIBOR submissions, did not reflect the rising costs of default insurance rates.

74.     In particular, *The Wall Street Journal*'s analysis reflected that the widest gaps
between the two measures involved the LIBOR rates reported by Citibank, West LB, HBOS plc
(which was acquired by Defendant Lloyds in 2009), JP Morgan and UBS.

75.     *The Wall Street Journal* found that the widest gap was reported by Citibank,
which said it could borrow dollars for three months at about 0.87 percentage points lower for
LIBOR purposes than the rate calculated using default insurance data.  A Citibank spokesman
said "We continue to submit our Libor rates at levels that accurately reflect our perception of the
market."

76.     For another example, West LB, which had been hit especially hard by the
financial crisis, was seen by investors on March 10, 2008 as being nearly twice as likely as
Credit Suisse to default on its obligations.  The next morning, West LB reported the same
LIBOR rate as did Credit Suisse.  Its rate reported for LIBOR purposes was 0.7% lower than its
default insurance rate would have indicated.  A spokesman for West LB said that the bank
provided accurate data.

77.     Among other Panel banks analyzed by *The Wall Street Journal*'s comparison of
LIBOR submissions to default insurance rates, HBOS appeared to underreport its LIBOR
submission by 0.57%.  A HBOS spokesman defended its LIBOR quotes as a "genuine and
realistic" indication of its borrowing costs.

78.    *The Wall Street Journal*'s analysis further concluded that JP Morgan underreported its LIBOR submission by 0.43%, and UBS underreported by 0.42%, both in comparison to their default insurance rates.

79.    *The Wall Street Journal* concluded that in the first four months of April, 2008, overall LIBOR submissions were underreported by about 0.25% in comparison to rates suggested by the default insurance market.  In mid-April, after the BBA announced its review of the LIBOR-fixing process, that difference shrank to an underreporting of about 0.15%.

80.    In mid-April 2008, the BBA announced that it was accelerating its review of the LIBOR fixing process, and stated that it would expel any bank found to be reporting rates inaccurately.  In response, over the next two days, the Manipulator Defendants greatly increased their rates.  *See* ¶¶ 1-3 *supra.*

81.    For a further example, financial instruments which were actually priced by the market, such as the bid rates on Eurodollar deposits (the "Eurodollar Bid Rate"), sharply diverged from their historical relationship with Dollar LIBOR.  Thus, the Eurodollar Bid Rate, or the rate bid by banks to attract Dollar deposits, had for decades tracked about 6 to 12 basis points below Dollar LIBOR, the rate at which banks offered such Dollar deposits to each other.  During the Class Period, however, that persistent relationship between Dollar LIBOR and the Eurodollar Bid Rate became inverted, such that the rate being paid by banks to attract Dollar deposits (*i.e.*, the Eurodollar Bid Rate) was higher than the rate being reported by the banks as the rate for offering Dollar deposits to other banks (*i.e.*, Dollar LIBOR).

82.    Another source of comparable interest rate data is a bank's ability to borrow in the commercial paper market.  In mid-April of 2008, UBS, which had written down $38 billion in investments, was offering to pay an annualized 2.85% rate to borrow dollars for three months in

the commercial paper market.  However, UBS submitted for purposes of LIBOR on April 16, 2008 that it could borrow for three months from other banks at 2.73%, a rate in line with all the other banks on the Panel.

83.     For a further example, interest rates on loans auctioned by the Federal Reserve reflect the fact that such loans require the borrower to put up collateral.  Dollar LIBOR is reported for uncollateralized loans.  During the Class Period, however, interest rates on less risky collateralized loans to banks from the Federal Reserve were higher than Dollar LIBOR.  According to BBA data, the difference between the three-month U.S. Dollar LIBOR and the U.S. Federal Reserve's target rate widened to a record 332 basis points on October 10, 2008.  That spread had averaged about 22 basis points over the previous ten years.

**The Manipulator Defendants had several incentives to agree to underreport their borrowing costs for LIBOR, creating a convergence of reported rates when actual conditions called for divergence**

84.     Such falsely understated interest rates were intended to and did give the erroneous and false perception that the banks were not having increasing difficulty in obtaining funds.

85.     Because banks which submit interest rate information to the BBA are not obliged to transact at the interest rates they submit, LIBOR depends for its reliability upon the willingness of the banks which contribute interest rate information to reveal their true, transactable quotes.

86.     Because the mechanism for deriving LIBOR involved dropping the highest and lowest submissions and then averaging the remaining rates, no single bank could hope to control LIBOR merely by underreporting its own costs of borrowing.  Only by agreeing to underreport in concert with each other could Defendants succeed in artificially reducing LIBOR.

87.     The BBA's publication of the Manipulator Defendants' own contributed rates would appear to provide a measure of enforcement of those rates, since customers in a competitive market could penalize banks for transacting at rates significantly different from their submitted rates. Upon information and belief, however, such transparency was used by the Manipulator Defendants both to signal each other as to their quoted levels and to enforce their agreement to submit only rates within a narrow range of that level.

88.     The Manipulator Defendants also shared an incentive to agree to underreport LIBOR in order to minimize their exposure to each other.  Absent the tight convergence in reported rates which Defendants had agreed to report, higher-reporting banks would have caused unwanted attention to their own financial stress as a threat not only to their own stability, but to that of the other banks in their roles as creditors and counterparties.

89.     It is therefore apparent that just as no single Manipulator Defendant could control LIBOR and reduce it artificially through its own reporting, no single Defendant could hope to attain the benefits of an artificially low LIBOR without the reciprocal underreporting by the other Manipulator Defendants.

**The Regulators Investigate Breaches of the "Chinese Wall" Within the Banks**

90.     The widespread use of LIBOR as a reference rate provided additional incentive for the Manipulator Defendants to enter into their conspiracy and to provide false and misleading rate submissions. Upon information and belief, the Manipulator Defendants intended to benefit and benefited from their conspiracy and manipulation by reason of their large market positions as net borrowers and in derivative contracts or other investments whose value was enhanced in the Manipulator Defendants' books by referencing LIBOR at artificially low levels.

91.     In connection with the above-referenced government investigations into the LIBOR reporting process, regulators are reportedly probing whether communications between bank traders and treasury personnel which report the LIBOR breached the regulatory wall intended to prevent the sharing of such information by different parts of the bank.

92.     The Manipulator Defendants' lies to the BBA were therefore intended to, and succeeded in, manipulating LIBOR to artificially low levels which did not reflect the true rates at which banks could borrow from each other in the London interbank market.  The result of the Manipulator Defendants' manipulation and agreement to provide false and misleading interest rate information has been to injure persons with market positions in investments which were harmed by referencing LIBOR at artificially low levels.

**Impact of The Conspiracy**

93.     One such instrument directly and negatively impacted by the Manipulator Defendants' manipulation and anticompetitive agreement to fix LIBOR is the Eurodollar futures contract.

94.     The price of the Eurodollar futures contract is based upon and inversely reflects U.S. Dollar LIBOR. As LIBOR falls, the price of Eurodollar futures contracts rises; as LIBOR rises, the Eurodollar futures contract price falls.

95.     Thus, by combining and agreeing to manipulate LIBOR to artificially low levels, the Manipulator Defendants caused the price of Eurodollar futures contracts to be artificially high during the Class Period, causing damage to Plaintiff and the Class.

96.     The Manipulator Defendants, directly or through their subsidiaries, affiliates or agents, planned and executed a scheme designed to cause LIBOR to be fixed at artificially low

25

levels and thereby to manipulate the price of Eurodollar futures contracts traded on the CME to artificially high levels.

97.     In 2008, following a report on the LIBOR-setting process, officials from the Bank for International Settlements in Switzerland stated that they could not rule out the possibility that LIBOR rates were manipulated, but that the process of removing the lowest and highest submitted reports probably "minimized" the impact of any possible manipulation.

98.     Plaintiff and Class members bring this suit pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, sustained by reason of the Manipulator Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

99.     Plaintiff and Class members also bring this suit pursuant to Section 26 of the Clayton Act, 15 U.S.C. § 26, to preclude the Manipulator Defendants' continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

100.    The Manipulator Defendants' unlawful conduct not only allowed them to avoid the perception that they were having increased difficulty in obtaining funds, but also produced exorbitant illegal profits, and caused actual damage to Plaintiff and others similarly situated, in violation of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 1 *et seq.*, and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq*.

101.    The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which the CME designs, creates the terms of, and conducts trading in, various commodity futures and options, including Eurodollar futures contracts.

102.    A futures contract is an agreement to buy or sell a commodity, such as Eurodollar deposits, at a date in the future. Every aspect of a futures contract traded on the CME is standardized, except the price. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

103.    The CME Eurodollar futures contract is the financial futures contract based on time deposits denominated in U.S. Dollars at banks outside the United States. Forty quarterly expirations and four serial (monthly) expirations are listed by the CME, providing for tradable contracts over a ten year period. The Eurodollar futures contract is one of the most liquid of futures contracts, particularly in the front month.

104.    Prices for the Eurodollar futures contract are determined by the forecast for the delivery month of the three-month U.S. Dollar LIBOR interest rate. A rise in the U.S. Dollar LIBOR three-month interest rate will cause the price of the futures contract to fall; a decline in U.S. Dollar LIBOR three-month interest rate will cause the price of the futures contract to rise.

105.    LIBOR is the most widely used "benchmark" or reference rate for short term interest rates globally, serving as the basis for interest rates on trillions of dollars in derivatives contracts, corporate and student loans and adjustable rate mortgages. It is used as the basis for settlement of interest rate contracts on many of the world's major futures and options exchanges, as well as most over-the-counter and lending transactions.

106.    LIBOR is "fixed" each morning for the following currencies: Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona, and U.S. Dollar. LIBOR for each currency is established by compiling interest rate reports from groups, known as Panels, of contributor banks. Panels for a particular currency may be composed of as few as eight or as many as sixteen rate-contributing banks.

107.    Pursuant to procedures established by the BBA, the contributing banks report interest rates to Reuters between 11:00 a.m. and 11:10 a.m. London time. Reuters compiles and arranges the reported interest rate data, discarding the top and bottom quartiles. Reuters then averages the middle fifty percent of the contributed data to produce the LIBOR fixing and publishes the average rates, as so calculated, as well as the individual Defendants' contributed rates, at around 11:30 a.m. London time. Errors may be corrected over the next thirty minutes, and Reuters then publishes the "LIBOR fixing" at noon London time.

108.    While the above-described "trimming" of the highest and lowest rates in the submitted information might ordinarily limit the impact of deliberately false reporting, upon information and belief Defendants' collusive agreement and signaling through their published submissions enabled them to submit narrowly dispersed rate quotes which rendered the discard process ineffective in preventing the manipulation.

109.    LIBOR is published simultaneously on more than 300,000 screens throughout the world each day. Among the major information vendors which distribute LIBOR are (in addition to Reuters) Thomson Financial, Bloomberg, Telekurs, Infotec, IDC, Quick, Class Editori and Proquote.

110.    The Manipulator Defendants' individually-submitted interest rate information was published each day together with Reuters' calculations of LIBOR. Because the daily LIBOR fixing allowed each Manipulator Defendant to see what each other Manipulator Defendant was reporting, the Manipulator Defendants were readily able to monitor each others' reports and thereby had the means needed to enforce their agreement and to keep their reported rates closely in line with one another.

111.    Moreover, upon information and belief, the Manipulator Defendants were in regular and virtually continuous contact with one another, including by having regular and extremely frequent communications with respect to their interest rates paid for short-term borrowings. During these ongoing communications, the Manipulator Defendants worked to report misinformation and to create false impressions of interest rate levels, specifically intending to manipulate LIBOR to benefit market perceptions of their financial health and liquidity but to the detriment of other market participants.

112.    The Manipulator Defendants knew that the falsely understated interest rate information they submitted was used by the BBA and Reuters to calculate U.S. Dollar LIBOR published throughout the world. They also knew that this information impacted CME Eurodollar futures contract (and other LIBOR-derived) prices.  The Manipulator Defendants intended to manipulate CME Eurodollar futures contract prices during the Class Period through their manipulation of the published U.S. Dollar LIBOR. The Manipulator Defendants manipulated the prices of CME Eurodollar futures prices during the Class Period by submitting false and artificial interest rate information.

113.    Thus, the necessary and foreseeable consequence during the Class Period of the Manipulator Defendants' agreement to misrepresent interest rates below their actual level, and their manipulative acts in reporting such falsely understated interest rates, was to cause the price of the Eurodollar futures contract to trade at artificially high levels. Such artificially high prices directly injured Plaintiff and the Class, who purchased Eurodollar futures contracts during the Class period at artificially high prices.

114.    Plaintiff and others similarly situated were damaged because CME Eurodollar futures contract and other standardized contracts priced on the basis of LIBOR prices were not

determined by market forces, but instead by the Manipulator Defendants' illicit manipulative activities and improperly-wielded market power.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:  All persons, other than Defendants and their employees, affiliates and subsidiaries (whether or not named in this complaint), who between January 1, 2007 and April 30, 2009, inclusive (the "Class Period") purchased CME Eurodollar futures contracts.

116.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of Class members purchased or sold standardized contracts at a disadvantageous price.

117.    Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class.  These common questions of law and fact include, without limitation:

        a.    Whether the Manipulator Defendants agreed to falsely underreport rate information;

        b.    Whether such agreement and false Manipulator violates the Sherman Antitrust Act;

        c.    Whether the alleged false reporting by the Manipulator Defendants violated the CEA;

        d.    Whether Defendants' aiding and abetting violates the CEA;

        e.    Whether Defendants' conduct was in violation of State law;

    f.   What effect Defendants' conduct had on the prices of Eurodollar futures contracts purchased by Plaintiff and the Class during the Class Period; and

    g.   The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

118.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained injuries and damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

119.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and antitrust class action litigation.

120.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of

inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

121.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## ANTICOMPETITIVE EFFECTS

122.    The aforesaid agreement, combination and conspiracy has had the following effects, among others:

   a.    published LIBOR rates were depressed to artificially low levels;

   b.    the discrepancy between LIBOR rates and default-insurance rates, which historically have moved in tandem with LIBOR, increased;

   c.    the prices of CME Eurodollar futures contracts, which are priced inversely to United States Dollar LIBOR averages, were increased to artificially high levels;

   d.    purchasers and sellers of financial instruments based upon LIBOR rates were deprived of free and open competition in the pricing of those instruments.

## INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

123.    During the period covered by this Complaint, Plaintiff and the other members of the Class purchased CME Eurodollar futures contracts. By reason of the alleged violations of law, Plaintiff and the other members of the Class paid more than they would have in the absence of the illegal contract, combination or conspiracy to manipulate LIBOR, and as a result, have been injured in their business or property and have suffered damages in an amount presently undetermined.

124.    The specific amounts of damages have not yet been determined because such determination will require discovery. When these amounts have been determined, Plaintiff will seek leave of Court to amend this Complaint to include such amounts.

## FRAUDULENT CONCEALMENT

125.    By its very nature, the unlawful activity, as alleged herein, that the Manipulator Defendants engaged in was self-concealing. The Manipulator Defendants, *inter alia*, falsely reported interest rate information to the BBA and Reuters in order to depress United States Dollar LIBOR to artificially low levels and thereby manipulate the price for Eurodollar futures contracts on the CME.

126.    Analysts offered various reasons in 2008 to explain the divergence of reported LIBOR rates and other market indices such as default insurance rates.  In light of the freezing up of the credit markets during the financial crisis, the dearth of lending by banks, even to each other, could have affected the accuracy of the borrowing rates they provided.  Others noted that some U.S. banks, such as Citibank and JP Morgan, had access to large customer deposits and borrowing from the Federal Reserve, such that they might not need more expensive loans from other banks.

127.    At the time of the financial crisis in 2008, representatives of the Manipulator Defendants said they provided accurate rates, and industry groups with connections to the Manipulator Defendants similarly attempted to refute assertions that the panel was falsely reporting interest rate information to depress United States Dollar LIBOR.

128.    During 2008, for example, the BBA stated that LIBOR was reliable, and that the financial crisis had caused many indicators to act in unusual ways.  A spokesman for the BBA

stated that there was "no indication" that the default insurance market provided a picture of banks' borrowing costs more accurate than that provided by LIBOR.

129.    Everything changed on March 15, 2011, when UBS released its annual report stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA.  UBS described the focus of the investigation as "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."

130.    The *Financial Times* reported on March 15, 2011 that the three United States agencies, the Japanese agency and the United Kingdom's Financial Services Authority had also requested information and had been interviewing witnesses connected to the Manipulator Defendants.

131.    In addition to UBS, Bank of America, Citibank and Barclays have received subpoenas.  The *Financial Times* has reported that "[a]ll the panel members are believed to have received at least an informal request for information—an earlier stage in an investigation process before a subpoena."

132.    In contrast to their earlier denials of misreporting, representatives of Deutsche Bank, Bank of America, Citigroup, JP Morgan, Barclays and Lloyds have specifically declined to comment since the March 15, 2011 disclosure of the government investigations as to whether the Manipulator Defendants colluded to artificially reduce LIBOR.

133.    In further contrast to its earlier statements that LIBOR was reliable, in February 2011 the BBA expanded the Panel of banks that contribute to U.S. dollar LIBOR from sixteen to twenty members.

34

134.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on March 15, 2011.

135.    Because the Manipulator Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on March 15, 2011.

136.    Due to the Manipulator Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

137.    In addition, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled by the filing of other cases against the Manipulator Defendants.

138.    The manipulator Defendants are equitably estopped to assert that any otherwise applicable period of limitations has run.

139.    The Manipulator Defendants' conduct as alleged herein constitutes a continuing violation of law.  Plaintiff and members of the Class bring this action within two years of the end of such continuing violation.

**COUNT I     MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT (7 U.S.C. § 1 *et seq.*)**

**(Against The Manipulator Defendants)**

140.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

141.    Plaintiff purchased one or more CME Eurodollar futures contracts during the Class Period, and was injured as a result of the Manipulator Defendants' manipulations of the price of those contracts, and/or the price of the Eurodollar underlying those contracts, in violation of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*.

142.    The Manipulator Defendants' activities alleged herein constitute manipulation of the price of Eurodollar futures contracts, the price of the Eurodollar underlying those contracts, and/or the prices of other standardized contracts which are based on Dollar LIBOR, in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

143.    As set out more fully above, during the Class Period, the Manipulator Defendants submitted false interest rate information to the BBA, with the knowledge that, as a result of the false reports, the United States Dollar LIBOR would be distorted to the benefit of the Manipulator Defendants, in violation of Section 4c of the CEA, 7 U.S.C. § 6c. The Manipulator Defendants were direct participants in this unlawful conduct to manipulate the price of Eurodollar futures contracts.

144.    Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

**COUNT II    AIDING AND ABETTING VIOLATIONS OF SECTION 22 OF THE COMMODITY EXCHANGE ACT(7 U.S.C. §  25)**

**(Against All Defendants)**

145.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

146.    Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of other Defendants'

manipulations of Eurodollar futures contracts prices, including by false reporting of interest rate information, and willfully intended to assist these manipulations to cause the price of CME Eurodollar futures contracts to reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

147.    Plaintiff and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

148.    As a further direct and proximate result of the acts of Defendants, Plaintiff and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

**COUNT III          VICARIOUS LIABILITY FOR MANIPULATION**

**(Against The Manipulator Defendants)**

149.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

150.    Each of the Manipulator Defendants is liable under Section 2(a)(1)(B) of the CEA. 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

**COUNT IV   *PER SE* VIOLATION OF SECTION ONE OF THE
SHERMAN ANTITRUST ACT**

**(Against The Manipulator Defendants)**

151.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

152.    The Manipulator Defendants combined, conspired and agreed to fix, maintain and inflate the prices of CME Eurodollar futures contracts, and other standardized contracts priced on the basis of Dollar LIBOR, by intentionally reporting false interest rate information to the BBA

and Reuters for the fixing of LIBOR. This is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

153.    Because of the Manipulator Defendants' combination, conspiracy or agreement, Plaintiff and the members of the Class have paid supra-competitive prices for Eurodollar futures contracts during the Class period and have been damaged in their property thereby. Unless enjoined, the Manipulator Defendants' contract, combination and conspiracy will continue.

**COUNT V            BREACH OF CONTRACT**

**(Against The Clearing Defendants)**

154.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

155.    The CME Rules, including without limitation Rule 432, to which every futures contract traded on the CME is subject and which provide standards of performance of such contracts, prohibit price manipulation.

156.    One of the terms of all CME Eurodollar futures contracts provides that such contracts financially settle to LIBOR.

157.    By intentionally misstating their LIBOR rates, the Manipulator Defendants caused the prices of such Eurodollar futures contracts to be manipulated and not to be the product of legitimate market forces of supply and demand.

158.    The conspiracy and other unlawful conduct of the Manipulator Defendants caused the Clearing Defendants, which were each subsidiaries or affiliates of the Manipulator Defendants and were counterparties to such futures contracts, to breach the CME Eurodollar futures contracts by imposing manipulated prices as settlement prices of those contracts in violation of CME rules, including without limitation CME Rulebook Chapter 452, and the

Clearing Defendants' duties to Plaintiff and members of the Class, including duties of good faith and fair dealing.

159.    Such multiple breaches of the CME Eurodollar futures contracts by causing artificial settlement prices further manipulated the benchmark prices for such contracts to which the market trades.

160.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Clearing Defendants therefor.

**COUNT VI        TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against The Manipulator Defendants)**

161.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

162.    By intentionally misstating their LIBOR rates and by causing the prices of CME Eurodollar futures contracts to be manipulated and not the product of legitimate market forces of supply and demand, the Manipulator Defendants induced the breach of such Eurodollar futures contracts by preventing Plaintiff and members of the Class from obtaining performance of such contracts at non-manipulated prices.

163.    Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from Defendants therefor.

**COUNT VII       TORTIOUS INTERFERENCE WITH BUSINESS OR ECONOMIC ADVANTAGE**

**(Against The Manipulator Defendants)**

164.    Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

165.     Plaintiffs and members of the Class had a reasonable expectation that the financial instruments they entered into whose prices were based upon LIBOR were priced upon free and open competition, and therefore that in entering into these transactions they were entering into valid business relationships.

166.     The Manipulator Defendants, who took pains to conceal their conduct in underreporting LIBOR, knew of the foregoing expectation of Plaintiff and members of the Class.

167.     The Manipulator Defendants' purposeful interference prevented the legitimate expectancy of Plaintiff and members of the Class from ripening into a valid business relationship at prices which were free of manipulation.

168.     As a direct result of the Manipulator Defendants' interference, Plaintiff and members of the Class have been damaged.

169.     Plaintiff and members of the Class have suffered injury by reason of such conduct and are entitled to recover from the Manipulator Defendants therefor.

**COUNT VIII          RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT**
**(Against The Manipulator Defendants)**

170.     Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

171.     It would be inequitable for the Manipulator Defendants to be allowed to retain the benefits which the Manipulator Defendants obtained from their illegal agreement and manipulative acts and other unlawful conduct described herein, at the expense of Plaintiff and members of the Class.

172.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed upon the benefits to the Manipulator Defendants from their unjust enrichment and inequitable conduct.

173.     Alternatively or additionally, each Manipulator Defendant should pay restitution of its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A) That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff denominated as Class representative and Plaintiff's counsel be appointed as counsel for the Class;

(B) That the Court enter judgment in favor of Plaintiff and the Class and against the Defendants, jointly and severally, including for the actual damages, as provided by law, determined to have been sustained by each Plaintiff and Class member for violations of the CEA;

(C) That the Court declare, adjudge and decree that the Manipulator Defendants have committed the violations alleged herein, including of Section 1 of the Sherman Act, and be enjoined from continuing the same;

(D) That the Court enter judgment in favor of Plaintiff and the Class and against the Manipulator Defendants, jointly and severally, including for the treble damages of each Plaintiff and Class member due to the violation of the Sherman Act;

(E)  That this Court award Plaintiff and the Class the return of their overpayments made by them;

(F)  That Plaintiff and the Class recover damages from the Manipulator Defendants for their violations of the common law;

(G)  That Plaintiff and the Class recover damages from the Clearing Defendants for their violations of the common law;

(H) That Plaintiff and the Class recover their costs of the suit, including attorneys' fees;

(I) That Plaintiff and the Class be granted injunctive relief against Defendants' violative conduct; and

(J) For such further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

Dated:  June 2, 2011

By: s/*Marvin A. Miller*
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois  60603
Telephone:  (312) 332-3400

Christopher Lovell
Gary S. Jacobson
Christopher M. McGrath
**LOVELL STEWART HALEBIAN
        JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900

Douglas G. Thompson, Jr.
Michael G. McClellan
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, N.W.
Washington, DC  20007
Telephone: (202) 337-8000

*Attorneys for Plaintiff*

42